Charles L. Gleaves v. Commissioner.
Gleaves v. Commissioner
Docket No. 7957.
United States Tax Court
1946 Tax Ct. Memo LEXIS 134; 5 T.C.M. (CCH) 616; T.C.M. (RIA) 46170; July 22, 1946
Charles L. Gleaves, pro se. William B. Springer, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: Petitioner seeks a redetermination of a deficiency in the amount of $246 in petitioner's income tax for the year 1941. The declared deficiency arose from the disallowance by the Commissioner of a claimed bad debt loss in 1941 in the amount of $1,000. The question presented is whether or not petitioner suffered a loss by reason of a bad debt in the taxable year 1941. Findings of Fact Petitioner is an individual residing in New York City. His income tax return for the year 1941 was filed with the collector of internal revenue for the second *135 district of New York. Petitioner is a practicing lawyer and has practiced law in New York since 1933 with the exception of his period of public service during the war from June 1940 to the summer of 1945. On March 15, 1935 petitioner and two others (known as the Associates) entered into an agreement with one Adolph A. Prussin which provided that the Associates were to put up $2,000 to defray the expenses of experiments to be conducted to test the possibilities of using as a motor fuel for combustion engines gasoline which had been solidified by a process which Prussin had invented. Said agreement also provided that when said experiments were completed the Associates had the privilege of putting up $20,000 and receiving fifty percent of the stock of a corporation which would become the owner of the patent rights upon said solidified process in so far as it applied to internal combustion engine fuel. Said agreement also provided that if the Associates were not satisfied with the result of the experiments Prussin would repay to them on demand the $2,000 put up by the Associates. Petitioner put up one-half of the money pursuant to said agreement, namely, $1,000. During the *136 spring and summer of 1935 the Associates and Prussin caused to be conducted at the Guggenheim Aeronautical Laboratory at Columbia University, New York City, experiments in which an internal combusion engine was run using solidified gasoline as fuel. Said experiments disclosed that the engine would run efficiently on solidified gasoline as fuel but when the fuel was about half consumed the gasification decreased so rapidly that the engine stopped. It then became apparent that if solidified gasoline could be developed as a fuel. completely new and unknown methods must be developed to secure gasification and the Associates suspended operations until funds could be raised by developing and marketing uses for solidified gasoline in other channels than in internal combustion engines. To develop these new channels it was agreed that Prussin should transfer to petitioner as trustee all the rights to manufacture, use and sell in the United States certain hydrocarbon products produced under certain patent applications which were then pending. Petitioner's wife also paid to petitioner, as trustee, $4,000 to finance this new development. The funds of the trust were all disbursed in this *137 development with the exception of $59.97 which petitioner, as trustee, returned to his wife. The last expenditure made from the trust fund in the promotion of the trust business was on July 6, 1936. In the fall of 1936 Prussin found a new financial backer to develop and sell solidified hydrocarbons and incorporated a socalled Shur-Lite Kindler Co. This company became bankrupt in November 1938. The patent application which Prussin had filed was rejected in the spring of 1937. On April 21, 1937, the parties to the trust agreement entered into in 1935 agreed to sell the assets of the trust and distribute the proceeds. Prussin agreed to buy these assets from money that was to be realized from the profits of the Shur-Lite Kindler Co. The rights, however, were never sold by the trustee. In 1939 Prussin procured a new financial backer in the development of kindlers and flares. This business venture also failed, probably some time in the early part of 1940. By June of 1940 Prussin had found another financial backer to engage again in the manufacture and sale of kindlers and flares. The petitioner, as attorney, drew up this promotion agreement. Petitioner at no time has demanded *138 repayment from Prussin of the money advanced by petitioner in 1935. At no time during the period 1935 to 1941 did petitioner believe Prussin to be a man of financial means sufficient to repay the sums advanced but at all times looked to the success of exploiting Prussin's invention as the source from which profits should be derived. Opinion In order for petitioner to establish his deductible loss in this case it will be necessary for him to prove either that the loss resulted from the occurrence of the worthlessness of an existing debt during the tax year 1941 or that it occurred during the year 1941 from a transaction entered into for profit though not connected with petitioner's trade or business. [1]
*139 Petitioner in his return set up the loss as follows: Amount advanced to Adolph A. Prussin in May 1935. Statute of limitation barred debts in 1941. From the findings of fact, however, it is obvious that this claimed deduction cannot be allowable as a bad debt loss in 1941 for the reason that the money advanced by petitioner was not a debt. See , the syllabus of which reads as follows: In order to entitle a taxpayer to deduct as a bad debt an item ascertained to be worthless, the item should have had an actual existence as a debt both in law and in fact. Also , in which the syllabus reads: To entitle a taxpayer to deduct from gross income, as a bad debt, an item ascertained to be worthless and charged off in a given year such debt must have had an existence in fact and in law. There is no evidence in the record that the petitioner at any time considered this advancement, which he made to the group of which Prussin was one party and the "Associates" constituting the other party, a debt. In his testimony he states that at no time from 1935 to 1941 did he believe that Prussin was financially *140 able to repay the $1,000 and at all times looked to the success of exploiting Prussin's invention as the source from which profits should be derived. Furthermore, the agreement between Prussin and the Associates specifically provides two conditions which must exist before Prussin could be expected to repay petitioner's advancement, even if he were financially able to do so. The agreement provided that if the Associates were dissatisfied with the results of the experiments which petitioner's advance was made to finance, then Prussin would repay the advancement "on demand." Thus, before this advancement could be converted into a debt the Associates must be dissatisfied with the experiments and make a demand for repayment. There is no direct testimony that petitioner was ever dissatisfied with the experiments. True, they were not wholly successful as anticipated but they did produce some results that were highly gratifying; so much so in fact, that while petitioner did not participate in raising $20,000 for manufacture and sale as was provided for in the agreement, he did agree to act as trustee in a trust in which he, his wife and Prussin would participate and to which petitioner's *141 wife advanced $4,000. This would not indicate that petitioner was dissatisfied with the experiments and he admits that he has never made any demand for repayment. Therefore it is our holding that there was never a debtor-creditor relationship between petitioner and Prussin. Furthermore, petitioner admits that he anticipated repayment from profits arising from the exploitation of Prussin's invention. The Patent Office rejected Prussin's application for a patent in 1938. Since petitioner at no time relied on Prussin for repayment and since the patent application on which he did rely was rejected in 1938 it would seem to be evident that prior to January 1, 1941, his debt, if it had ever existed, should cease to have any recoverable value. Neither can petitioner's loss from his investment be held to have occurred during the taxable year 1941, although petitioner has never based his claim for deduction on anything except the occurrence of worthlessness of a bad debt. In view of the provisions of the statute this additional possible basis of a loss claimed might be considered. It is too well established for further discussion that losses under section 23 (e) (2) must be taken in the *142 year in which they occur. See . In this case the taxpayer had claimed a loss based upon advice from a representative of the revenue department but the court held that it was not the advice of the representative of the revenue agent but the year of the occurrence of the loss that controlled. See also . The fact that in the last interview which occurred between Prussin and the petitioner in June of 1940, and at which time petitioner acted as Prussin's attorney in the drawing up of an agreement between Prussin and one of his many later financial backers, and that petitioner at that time did not even mention the repayment to him of the $1,000 which petitioner had invested in 1935, is a very strong circumstance corroborating the finding of the Commissioner that this claim had no value as of December 31, 1940 and that therefore petitioner could not have suffered his loss during 1941. Judgment will be entered for the respondent. Footnotes
1. SEC. 23. [I.R.C.] DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) LOSSES BY INDIVIDUALS. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or * * *
(k) BAD DEBTS. - (1) GENERAL RULE. - Debts which become worthless within the taxable year; * * *↩